MONROE COTTON MILLS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3310.   Promulgated February 18, 1927.

1. The depreciated cost of certain looms discarded during the years 1917, 1918, and 1919 *held* to be a legal deduction from gross income.

2. The petitioner sold its entire product through a firm of selling agents in New York City. In 1918 it received an order through its selling agents for 300,000 yards of a certain grade of cloth, the order to be filled prior to November 30, 1918, and the cloth to be shipped as directed later. The cloth was manufactured and invoiced to its selling agents in New York City but the purchaser, finding that the first shipments received were not in accordance with specifications, refused to receive the balance during the year 1918. *Held,* that the manufactured cloth not shipped should have been included in petitioner's inventory at December 31, 1918, at the cost thereof.

*J. C. Murphy, Esq.,* for the petitioner.
*Ward Loveless, Esq.,* for the respondent.

This proceeding is for the redetermination of deficiencies for the years 1917, 1918, and 1919 in the respective amounts of $4,334.59, $21,708.11, and $8,109.88. There are two issues involved, namely, (1) whether the petitioner sustained a deductible loss in discarding certain of its factory machinery in the years 1917 and 1918, and (2) whether the proceeds from a certain contract for the sale of

manufactured goods entered into during the year 1918 constituted income in that year or subsequently.

### FINDINGS OF FACT.

The petitioner is a corporation organized under the laws of Georgia, with its principal office and factory at Monroe. It is engaged in the business of manufacturing cotton cloth, operating both spindles and looms and employing the usual processes for manufacturing cloth from raw cotton.

The corporation was organized in the year 1895 and the factory put in full operation during the year 1900. It has continued to operate up to the present time.

In the year 1917 the petitioner found it necessary to replace certain of its factory equipment with more modern machinery. During that year and the two succeeding years, a large number of its looms were removed from the factory and new automatic looms were installed. The discarded looms were known as the plain, heavy type Whiting looms and were designed for manufacturing sheeting and twills. The first lot of these looms was installed during the early part of the year 1896. There were 120 of this lot. About two years later 40 more of the same type looms were installed. The cost of these looms is not shown. During or about the year 1900, 150 more of the same type looms costing $50 each were installed. During or about the following year, 30 more looms costing $57 each were installed. By about the end of the year 1901 a total of 530 looms of this type had been installed in the factory.

During the year 1917, 300 of the old looms were discarded and replaced with new automatic looms. The discarded looms were sold at salvage value for $3,000. Of these looms, 150 had been installed during the year 1899 or 1900 at a cost price of $50 each. They had been in use up to the time they were discarded in 1917. During the year 1918, 102 more of the old looms were discarded. During the year 1919, the 30 looms costing $57 each were discarded. These looms had not been operated since 1915 or 1916. In prior years the factory had been operating both day and night. The non-use of a part of the discarded looms had resulted from the discontinuance of night operation.

The old looms when discarded were in good working condition and capable of practically as efficient work as when new, but it was considered unprofitable to operate them in competition with the new type of automatic looms. On a comparative basis of unit production, the old looms were capable of a production of 75 per cent or 80 per cent as against a production for the new looms of 90 per cent or 95 per cent. One weaver could operate only about 8 of the old

looms successfully, while, of the new looms, a weaver could operate 14 or 15 in weaving sateens and as many as 26 in weaving sheetings.

All of the looms in use were kept in a highly efficient state of repair. The working parts of the looms, such as pick balls, cams, crank shafts, gears, etc., were replaced with new parts whenever they became sufficiently worn to lessen materially the efficiency of the loom. This was necessary in order to produce the good quality of cloth that the trade demanded.

The March 1, 1913, depreciated cost of the looms was in excess of their depreciated cost at the date of abandonment.

During the year 1918 the firm of Haines, Morehouse & Woodford, of New York City, selling agents for cotton mills, were the sole selling agents of the petitioner under the terms of a contract entered into in the year 1916. This contract of employment provided in part as follows:

SECOND: The said parties of the second part [Haines, Morehouse & Woodford] agree to use their best endeavors to sell the output of said mills and guarantee said party of the first part against any loss from bad debts on goods received by them and sketched as having been sold for said party of the first part, and the said parties of the second part also agree on the receipt of goods to advance to said party of the first part on all of said goods so shipped to them or by their instructions up to seventy-five (75%) per cent of the net cash value of the said shipments, and it is also agreed between the parties hereto that said parties of the second part are to have a first lien on said goods for the amount of such advances so made.

After this contract had been entered into it was the practice of the petitioner to invoice all goods manufactured by it upon orders received to Haines, Morehouse & Woodford. The petitioner's books of account were kept upon the accrual basis. When the goods were invoiced to the selling agents the selling agents were charged with the sales price and were credited with their commissions upon the goods invoiced.

In May, 1918, the petitioner received through the aforementioned agents an order on behalf of M. Lowenstein & Sons, Inc., of New York City, dated May 29, 1918, for 300,000 yards of a certain cloth, to wit, as hereinafter described.

Fabric_____ 4 Leaf Twills. Tape Salvage
Width_____ 37 inches. Count, warp 88. Filling, 40.
Weight_____ Not lighter than 2.85 yards to lb.
Price per yard_____ 30 cents.
Terms_____ 2% 10 days 60 extra and subject to our usual commission.
Delivery_____ At mill, November—earlier if possible.
Ship to_____ As directed later.
Freight prepaid to New York City, or to such finishing works as it is usual for us to prepay freight.
Seconds up to 5 per cent to be taken at 10 per cent less per yard.
Seconds to be included in above quality.

The order from which the foregoing material parts are taken resulted from the exchange of certain letters and telegrams between the petitioner and its agents, Haines, Morehouse & Woodford, and constituted the final contract for the sale of the goods.

The goods specified in the contract were a usual and ordinary product of the petitioner's factory. During the year 1918 the entire 300,000 yards, plus an additional 128 yards of such goods, were manufactured and invoiced to Haines, Morehouse and Woodford between November 9 and November 27, 1918. It was the custom for the petitioner to invoice contract goods to its agents, Haines, Morehouse & Woodford, prior to shipment in order to secure money advances thereon. Such advances were made on the aforementioned invoices and interest to the amount of $1,415.93 was subsequently paid thereon. All of the goods so invoiced had been packed in bales ready for shipment on receipt of shipping instructions from M. Lowenstein & Sons, Inc., and each bale was given a number as a means of identifying it. Commissions on the total sales amounting to $2,271.08 were credited to Haines, Morehouse & Woodford during the year 1918.

At December 31, 1918, 67,197 yards of the contract goods had been shipped by the petitioner pursuant to the aforementioned contract. No further shipping orders were received during 1918, nor were any of the remaining 232,931 yards of the contract goods shipped during that year. The refusal of M. Lowenstein & Sons, Inc., to give shipping instructions for the remainder of the contract goods was due to dissatisfaction with the quality of the goods already shipped. It was alleged in numerous complaints by M. Lowenstein & Sons, Inc., that the goods in question did not measure up to the standards specified in the contract, in that certain of the pieces were underweight and contained flaws such as "picks" and "hanging threads." These complaints were made to Haines, Morehouse & Woodford as early as October, 1918.

The superintendent of the petitioner's mills went to New York in the early part of 1919 to inspect some of the goods previously shipped and found that the above-mentioned defects did exist. The petitioner sought legal advice with respect to enforcing compliance with the terms of the contract and was informed that it would not be advisable to bring suit. Finally, it was agreed by way of settlement, about the middle of 1919, that M. Lowenstein & Sons, Inc., should accept the remaining 232,931 yards of goods on consideration that the petitioner allow a credit on the original contract purchase price of $15,000. By way of further adjustment the petitioner reexamined all of the remaining goods in its warehouse, going over each bale and removing all light or defective pieces and substituting newly manufactured and better quality pieces

instead. A part of the goods already shipped prior to December 31, 1918, had been so treated before shipment.

The remaining 232,931 yards of cloth were shipped as directed by M. Lowenstein & Sons, Inc., on the following dates in the amounts named:

| Date. | Yards. |
| --- | --- |
| January 29, 1919 | 25, 237 |
| June 4, 1919 | 44, 107 |
| June 4, 1919 | 55, 124 |
| September 16, 1919 | 24, 799 |
| November 4, 1919 | 23, 176 |
| November 4, 1919 | 35, 921 |
| January 4, 1920 | 9, 649 |
| January 19, 1920 | 14, 918 |

The petitioner had little or no direct communication with M. Lowenstein & Sons, Inc., relative to the transactions. Practically all negotiations, including the aforesaid final settlement agreement, were conducted by and through Haines, Morehouse & Woodford. As was the general custom, the purchase price for the goods was paid by the purchaser to Haines, Morehouse & Woodford and payment was made by them to the petitioner.

Under date of May 26, 1919, an entry was made on the books of the petitioner charging the aforementioned $15,000 to " cloth account," and Haines, Morehouse & Woodford was credited with a like amount on the ledger. The petitioner's closing inventory for 1918 excluded the aforementioned 232,931 yards of cloth invoiced during that year to Haines, Morehouse & Woodford. In making its income-tax return for 1918 the petitioner included in the gross income the total amount of the sales price of the goods under the said contract with M. Lowenstein & Sons, Inc., and deducted from gross income the commissions credited to Haines, Morehouse & Woodford on the total contract sales. The cost and inventory value of the said 232,931 yards of cloth was $40,147.87. The sale price of the same was $69,879.30.

The statutory invested capital of the petitioner for the year 1918, without any adjustment on account of the inventories here in question, was $250,983.23.

### OPINION.

SMITH: The losses resulting from discarding certain of its looms during the years 1917 and 1918, in whatever amount actually sustained are proper deductions from net income for those years under the provisions of section 234 (a) (7) of the Revenue Act of 1918. *Appeals of Dilling Cotton Mills*, 2 B. T. A. 127; *Automatic Transportation Co.*, 3 B. T. A. 505, *et alia*.

The evidence is convincing that at least a part of the losses claimed was actually sustained. It is shown that all of the looms in question

had been in use for about seventeen or eighteen years. They were all of the same type and pattern and had cost approximately the same when new. The records showing the actual cost of each lot of looms were not available, but it was shown that one lot had cost $50 each and another lot $57 each. A minimum cost price of $50 each may be ascribed to all of the looms discarded.

It is further shown that all the looms had been kept in good repair; that the working parts were renewed from time to time as they became worn. J. Wheeler Mears, superintendent of the factory since it first began operation, testified that the old looms when discarded were capable of practically as efficient work as when new, and that they would not have been discarded but for the fact that the new automatic looms could be operated more economically and more profitably. There is no doubt that the petitioner was forced under stress of keen competition and marked industrial progress to abandon the old looms long before the expiration of their natural useful life. Under the taxing statute above referred to, the petitioner should be allowed the deduction of whatever loss was thus sustained.

While it may be true, as contended by the petitioner, that the looms with proper care might have been kept in use indefinitely, we are inclined to set a more conservative limit on their actual useful life. *Appeal of Dilling Cotton Mills, supra.* The evidence warrants a finding that the loss on each discarded loom was $25, or 50 per cent of the minimum cost thereof, less $10 salvage value of each loom.

Under the terms of the contract of sale evidenced by the order set forth in the findings of fact, the petitioner agreed to sell M. Lowenstein & Sons, Inc., a certain quantity of a specified kind of cloth on or before November 30, 1918. The order was dated May 29, 1918. At that time the goods were neither ascertained nor manufactured. During the year 1918 the goods were all manufactured but not all shipped. The petitioner kept its books of account upon the accrual basis and its books of account for 1918, as originally closed for that year, showed the sale of the total amount of the goods ordered through its selling agents at the contract price and they also showed a credit to the selling agents of the commissions to which they were entitled in respect of the order. The petitioner now contends that its books of account were in error in this regard; that the cloth had not been shipped to M. Lowenstein & Sons, Inc., during the year 1918, and that there was no way by which the purchaser could be required to accept the goods inasmuch as the purchaser had the right to satisfy itself that the goods were of the description and quality ordered before they were bound to accept them; that the goods were not sold within the year 1918, and that

the goods which had been manufactured for the order but not shipped at December 31, 1918, should have been reflected in the petitioner's inventory at cost and not in sales at the contract price. The respondent contends that, inasmuch as the petitioner made its returns upon the accrual basis, and inasmuch as the books of account show that the goods manufactured for the order were sold during the year 1918, the petitioner is obligated to include in its income for 1918 the profit which it would have received upon the contract if the goods had been accepted by the purchaser at the contract price.

The contract here in question was made in New York State and is governed by New York law. Section 128 of the Personal Property Law (Laws 1909, ch. 45) provides in part:

1. Where goods are delivered to the buyer, which he has not previously examined, he is not deemed to have accepted them unless and until he has had a reasonable opportunity to examine them for the purpose of ascertaining whether they are in conformity with the contract.

The rule under the common law was the same. It is unnecessary to review the innumerable cases in point. The rule was clearly laid down by the Supreme Court in *Pope* v. *Allis*, 115 U. S. 363. The court there said:

When the subject-matter of a sale is not in existence, or not ascertained at the time of the contract, an undertaking that it shall, when existing or ascertained, possess certain qualities, is not a mere warranty, but a condition, the performance of which is precedent to any obligation upon the vendee under the contract; because the existence of those qualities being part of the description of the thing sold becomes essential to its identity, and the vendee can not be obliged to receive and pay for a thing different from that for which he contracted. * * *

The authorities cited sustain this proposition, that when a vendor sells goods of a specified quality, but not in existence or ascertained, and undertakes to ship them to a distant buyer when made or ascertained, and delivers them to the carrier for the purchaser, the latter is not bound to accept them without examination. The mere delivery of the goods by the vendor to the carrier does not necessarily bind the vendee to accept them. On their arrival he has the right to inspect them to ascertain whether they conform to the contract, and the right to inspect implies the right to reject them if they are not of the quality required by the contract. The rulings of the Circuit Court were in accordance with these views.

The goods here in question were rejected during the year 1918 and found to be in fact subject to the imperfections charged by the buyer. Only after material adjustments were made was the contract ever fully performed.

We have no doubt that the course followed by the petitioner was the natural and customary one according to good business practices and within the reasonable expectation of the contracting parties. The petitioner's books of account for 1918 did not reflect its true income for the year 1918 for the reason that they reflected a profit

upon the sale of goods to M. Lowenstein & Sons, Inc., in excess of the true profit. At the close of 1918, M. Lowenstein & Sons, Inc., was under no binding contract to accept the goods which had been manufactured for it by the petitioner but which did not measure up to specifications and which had not in point of fact been accepted by the purchaser. The Commissioner's own regulations (article 1581, Regulations 45) provide:

The inventory should include merchandise sold but not shipped to the customer at the date of the inventory, together with any merchandise out upon consignment.

The 232,931 yards of cloth having an inventory value of $40,147.87 at December 31, 1918, should have been included in the petitioner's inventory at that date and not in its sales at the price of $69,879.30. Likewise, the petitioner should not have deducted from gross income any commissions in respect of these goods which had been credited upon its books of account to Haines, Morehouse & Woodford.

*Judgment will be entered on 15 days' notice, under Rule 50.*